UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SAMUEL EUGENE CALHOUN,

                    Petitioner,                Case No. 1:09-cv-468

v.                                        Honorable Robert Holmes Bell

JOHN PRELESNIK,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner is serving a term of life imprisonment, imposed by the Berrien County Circuit Court on September 17, 2001, after a jury convicted Petitioner of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b(1)(b).  In his amended *pro se* petition, Petitioner raises eight grounds for relief, as follows:

    I.        TRIAL COUNSEL MADE SERIOUS MISTAKES THAT DENIED PETITIONER EFFECTIVE ASSISTANCE OF COUNSEL AND HIS RIGHT TO A FAIR [] TRIAL, WHERE HE:  FAILED TO PROPERLY INVESTIGATE THE CASE AND PREPARE FOR TRIAL; FAILED TO TIMELY FILE NECESSARY PRETRIAL MOTIONS, ELICITED IRRELEVANT AND PREJUDICIAL TESTIMONY IN THE CROSS-EXAMINATION OF PROSECUTION WITNESSES, FAILED TO INSURE THAT THE JURY WAS PROPERLY INSTRUCTED, AND FAILED TO PROVIDE ANY RATIONAL DEFENSE BASED ON CONSTITUTIONALLY SOUND TRIAL STRATEGY TO THE FIRST-DEGREE CRIMINAL SEXUAL CONDUCT CHARGE.

    II.      THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR WHERE IT DENIED APPOINTED COUNSEL'S MOTION TO WITHDRAW, AND PETITIONER'S MOTION FOR NEW

COURT APPOINTED COUNSEL BASED UPON HIS DISSATISFACTION WITH HIS COURT APPOINTED COUNSEL WHERE HE ARTICULATED SEVERAL VALID REASONS FOR SUBSTITUTION AND THERE WAS NO SUBSTANTIAL PREJUDICE TO THE PROSECUTION.

    A.    THE TRIAL COURT FAILED TO EXERCISE DISCRETION IN DENYING PETITIONER'S PRETRIAL MOTIONS.

III.    PETITIONER WAS DENIED HIS RIGHT TO A FAIR TRIAL UNDER THE MICHIGAN AND FEDERAL CONSTITUTIONS BY THE INTENTIONAL PROSECUTORIAL MISCONDUCT, IN IMPROPER AND HIGHLY PREJUDICIAL ARGUMENT TO THE JURY WHEN SHE: VOUCHED FOR THE TRUTHFULNESS OF HER WITNESSES[;] DENIGRATED THE PETITIONER, HIS DEFENSE, AND DEFENSE COUNSEL; APPEALED TO THE CIVIC DUTY OF THE JURORS AND SYMPATHY FOR THE VICTIM AS A BASIS TO CONVICT, ARGUED FACTS NOT IN EVIDENCE, MISCHARACTERIZED THE EVIDENCE AND MISREPRESENTED THE APPLICABLE LAW.

IV.    THE TRIAL COURT ERRED REVERSIBLY IN FAILING TO GIVE THE JURY PROPER FINAL CAUTIONARY INSTRUCTIONS, REGARDING THE LIMITATION OF ITS USE OF THE SIMILAR ACTS EVIDENCE, IN CHILD CSC CASES, CJI2d 20.28, A CONTROLLING ISSUE IN THE CASE.

    A.    COUNSEL WAS INEFFECTIVE FOR FAILING TO INSURE THAT THE COURT READ THE REQUESTED INSTRUCTION REGARDING "SIMILAR ACTS" EVIDENCE, IN CHILD CSC CASES, CJI2d 20.28, AND REQUEST THAT THE COURT GIVE THE JURY OTHER ESSENTIAL CAUTIONARY AND LIMITING INSTRUCTIONS.

V.    PETITIONER WAS DEPRIVED OF HIS LIBERTY, WHEN HE WAS NOT AFFORDED DUE PROCESS OF LAW, AND THE COURT ACTED WITHOUT JUDICIAL POWERS FOR WANT OF SUBJECT-MATTER JURISDICTION; WHERE, THE ISSUANCE OF ARREST WARRANT FAILED TO MEET MINIMAL CONSTITUTIONAL STANDARDS AND VIOLATED THE FO[U]RTH AMENDMENT WARRANT REQUIREMENT; THUS, RENDERING THE COURT'S PROCEEDINGS, ACTIONS AND JUDGMENTS AB[]INIT[I]O, JURISDICTIONALLY NULL AND VOID; AND THE IMPRISONMENT OF THE PETITIONER THEREUNDER UNCONSTITUTIONAL; PURSUANT TO THE FOURTH

AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION REQUIRING THE COURT'S JUDGMENT AND SENTENCE TO BE FORTHWITH SET ASIDE.

VI.   APPELLATE ATTORNEY MADE SERIOUS ERRORS AND WAS CONSTITUTIONALLY INEFFECTIVE WHERE:  HE BREACHED HIS DUTY TO SUBSTANTIALLY INVESTIGATE PETITIONER'S CASE ON APPEAL FOR A CAPITAL OFFENSE AND NEGLECTED TO RAISE CONSTITUTIONAL ISSUES RESERVED ON RECORD FOR REASONS OTHER THAN WHERE THERE WERE A SOUND AND REASONABLE STRATEGIC ADVANTAGE; WHERE HE FURTHER [] FAILED TO FILE A PERTINENT MOTION IN THE COURT FOR GINTHER, IN ORDER TO MAKE A FACTUAL RECORD ON THE INCOMPETENT PERFORMANCE OF TR[IA]L DEFENSE COUNSEL FOR FEDERAL HABEAS CORPUS REVIEW, WHOSE DEFICIENT PERFORMANCE FELL FAR BELOW AN OBJECTIVE STANDARD OF REASONABLENESS, AND DENIED PETITIONER EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL, AS GUARANTEED BY HIS SIXTH AMENDMENT TO THE U.S. CONSTITUTION; BEING THE SAME ON APPEAL.

VII.   PETITIONER WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL UNDER THE MICHIGAN AND FEDERAL CONSTITUTIONS, WHERE:   THE PROSECUTRIX INTENTIONALLY WITHHELD MATERIAL EVIDENCE, AND SHOWED BAD FAITH BY VIOLATING DISCOVERY ORDERS AND RULES AFTER THE REQUEST HAD BEEN MADE BY THE DEFENSE; PROSECUTRIX DELIBERATELY AND METHODICALLY MISCHARACTERIZED EVIDENCE, AND MISREPRESENTED THE APPLICABLE LAW TO CONFUSE JURORS AND CAUSE UNFAIR PREJUDICE TO THE PETITIONER.

A.   THE EVIDENCE PRESENTED AT PETITIONER'S TRIAL WAS LEGALLY INSUFFICIENT TO CONVICT HIM OF CRIMINAL SEXUAL CONDUCT IN THE FIRST DEGREE.

VIII.   PETITIONER WAS DENIED THE PROTECTIONS GUARANTEED BY THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION; WHERE, HE WAS CONVICTED BY A JURY THAT WAS DRAWN FROM A VENIRE THAT UNCONSTITUTIONALLY UNDERREPRESENTED THE MINORITY REPRESENTATION IN THE COMMUNITY FOR A FAIR CROSS-SECTION.

A. THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED PETITIONER'S DUE PROCESS RIGHTS, BY EMPANELING A JURY WHOSE MEMBERS WERE REF[]ERRED TO ONLY BY JUROR NUMBERS; MOREOVER, THE TRIAL COURT IN REGARDS TO THE JURORS PROPOSED ANONYMITY, ISSUED A STATEMENT TO THE JURY THAT SUCH PRECAUTIONS WERE TO PROTECT THEIR PRIVACY; THUS, PREJUDICED PETITIONER AND DEPRIVED HIM OF HIS FUNDAMENTAL RIGHTS TO AN UNBIASED JURY.

IX. [PETITIONER] IS ENTITLED TO RESENTENCING WHEN THE STATUTORY SENTENCING GUIDELINES WERE MISSCORED AS TO THE PRIOR RECORD VARIABLES, DUE TO THE SENTENCING COURT'S ENHANCEMENT OF [PETITIONER'S] SENTENCE WITH PRIOR CONVICTIONS DEEMED UNCONSTITUTIONAL IN LIGHT OF GIDEON V WAINWRIGHT.

(Mem. in Supp. of Pet., docket #2, Page ID##22-23; Mot. to Amend the Pet., docket 46, Page ID#256.[1]) Respondent has filed an answer to the petition (docket #22) stating that all the grounds should be denied because they are either procedurally defaulted or without merit. Upon review and applying the AEDPA standards, I find that the habeas grounds are either without merit, procedurally defaulted, or noncognizable on habeas review. Accordingly, I recommend that the petition be denied.

---

[1]In his brief in support of his original habeas application, Petitioner listed these eight grounds, the first four of which were raised on direct appeal. (Docket #2.) However, the petition itself listed only the first four grounds. Because his original petition did not comport with Rule 2(d), RULES GOVERNING § 2254 CASES or W.D. Mich. LCivR 5.6(a), the Court ordered Petitioner to file an amended petition. (Docket #8.) In its order, the Court advised Petitioner that, because his new petition would take the place of his prior petition, he was required to list in his amended petition all of the issues he intended to raise on habeas review. (*Id.*) The Court specifically instructed Petitioner that he need not refile his brief or any attachments. (*Id.*) In his amended petition, Petitioner raised only the first four issues. (*See* Docket #9.) The Respondent filed an answer to the petition on September 10, 2010, responding only to the first four issues, as they were raised on direct appeal. (*See* Docket #22.) Petitioner filed a reply brief (docket #23) on October 6, 2010, indicating that his original habeas brief contained eight issues, and, by amending his petition, he did not intend to waive any of those issues. In addition, on November 19, 2010, Petitioner moved to amend his petition (docket #46) to add the ninth habeas ground. The Court granted his motion on December 14, 2010 (docket #49). Despite the confusing nature of Petitioner's filings, and notwithstanding his failure to comply with the Court's order to amend and to include all issues Petitioner intended to raise, I will consider all nine issues.

- 4 -

**Procedural History**

A.   **Trial Court Proceedings**

The state prosecution arose from Petitioner's sexual assault of his 14-year-old step-daughter, which resulted in a pregnancy.  One week before trial,  on July 17, 2001, Petitioner moved to adjourn the trial for one month for several reasons: the unavailability of medical witnesses; the pendency of a separate prosecution for sexual assault against Petitioner; the delayed receipt of a copy of the DNA analysis conducted by Paul Donald of the Michigan State Police Crime Laboratory (MSP crime lab); the possibility that Petitioner might need to obtain his own DNA expert; and Petitioner's mother's attempts to obtain a mortgage on her house in order to retain counsel of Petitioner's choice.  (Def.'s Mot. to Adjourn, docket #35.)  The matter was heard on July 18, 2001. (Tr. of Hr'g on Mot. to Adjourn at 4-5, docket #28.)  The prosecutor did not oppose a short delay, but she opposed delay of more than a week or two, given the victim's imminent return to school on August 22, 2001.  In addition, the prosecutor contended that Petitioner had had many months to arrange for other counsel, but had only begun to do so immediately before trial.  (*Id.* at 7-8.)  The court denied the motion, concluding that Petitioner's existing counsel was extremely competent and that Petitioner's family could have begun raising the money to retain counsel months before the date of the motion to adjourn.  (*Id.* at 9-13.)

One day after the hearing, defense counsel filed four additional motions:  (1) a motion for a forensic evaluation (docket #36); (2) a motion for the prosecutor to obtain interstate subpoenas (docket #37); (3) a motion to determine which of the two CSC I cases was set for trial on July 25,

2001[2] (docket #38); and a motion to obtain funds for a medical examination (docket #39).  Those motions were heard the opening day of Petitioner's trial, which began on July 25, 2001, and concluded on July 27, 2001.[3]  In addition, on the morning of trial, counsel moved to withdraw, alleging a breakdown in the attorney-client relationship.  (Tr. I at 19.)  The court denied all motions.  (*Id.* at 9, 16-19, 25.)

The victim, K.H., was the first witness called by the prosecution.  At the time of trial, K.H. was 15 years old.  (*Id.* at 169.)  K.H. had one sister and six brothers.  Petitioner was married to Pamela Harris, the mother of K.H., though they were in the process of divorcing at the time of trial.  (*Id.* at 170-71.)  Petitioner had lived with the family of K.H. since the time she was a baby, both in Chicago, Illinois and in Niles, Michigan.  (*Id.* at 172.)  They moved from South Morgan Street in Chicago after Petitioner shot a man on their porch.  (*Id.* at 261-64.)

K.H. gave birth to a baby boy on February 12, 2001.  She became pregnant during eighth grade, in May, 2000, when she was 14 years old, after Petitioner had penile-vaginal intercourse with her.  (*Id.* at 173-75, 177.)  At the time she became pregnant, she was living with her mother, four of her brothers, and her step-father, Petitioner, in Niles, Michigan.  (*Id.* at 176.)  According to K.H., Petitioner began sexually abusing her when she was in second grade.  He had sexual intercourse with her at least 30 times, and he touched her breasts, put his fingers in her vagina, and instructed her to suck on his penis on multiple other occasions, both before and after she became

---

[2]Petitioner also was charged in a separate case for alleged criminal sexual conduct against another of his step-daughters.

[3]Trial transcripts from the three-day trial will hereafter be referenced as follows:

July 25, 2001:  Tr. I at ____.
July 26, 2011:  Tr. II at ____.
July 27, 2001:  Tr. III at ____.

pregnant.  (*Id.* at 179-80.)  Petitioner was a long-distance truck driver, so he would be gone for up

to two weeks at a time, but Petitioner would have sex with her sometimes daily when he was home.

(*Id.* at 180, 189-91.)  The incidents occurred mostly in the evenings, after her brothers had gone to

bed and when her mother was working.  (*Id.* at 178, 206.)  Most of the time, the incidents occurred

either in the living room or in her mother's bedroom.  (*Id.* at 221.)  One time, her younger brother

Lance came downstairs and saw her pants on the floor.  (*Id.* at 207-208.)  Petitioner made K.H. hide

behind the couch, and ordered Lance to go back upstairs.  She put her shorts on and offered to make

Lance a sandwich, but he declined.  She hugged Lance, and he commented, "[Y]ou smell like

daddy."  She looked at him and said, "I do?"  And he responded, "Yeah."  (*Id.* at 208.)  Lance later

told K.H.'s mother that K.H.'s pants had been on the floor, so K.H.'s mother asked her why they

were there.  K.H. responded that they must have fallen out of the laundry basket.  (*Id.*)

       After she became pregnant, K.H. did not initially tell anyone that Petitioner was the

father, because she was afraid of being hurt for saying something.  (*Id.* at 180.)  Petitioner had always

told her that she should not tell anyone and that the sexual acts were a secret between them.  K.H.

testified that the sexual acts made her feel nasty.  (*Id.* at 181.)  When her mother noticed her

pregnancy, K.H. initially made up the name of the father, "Tim," and said that Tim had moved, as

Petitioner had told her to do.  (*Id.* at 210, 247, 249, 256.)  On October 22 or 23, 2000, she went to

a home in Plymouth, Indiana, where she stayed until she delivered the baby.  (*Id.* at 205, 231.)  She

eventually told her brothers, Ramone and Jesse, ages 14 and 16, and she later told her mother and

her sister, Bridgette.  (*Id.* at 182.)

       After she moved to Plymouth, Petitioner came to see her a number of times,

continuing to tell her to lie about his involvement.  (*Id.* at 235-36, 249, 253.)  Sometime between

- 7 -

Thanksgiving and Christmas, Petitioner told her that he was scared that, if people found that he had

made her pregnant, he would be in a lot of trouble. (*Id.* at 235-36.) He visited again later, taking

her out for something to eat. He told her that her mother had been acting funny, but K.H. denied

knowing anything about it. (*Id.* at 236.) Petitioner came to the home again before K.H. had to go

to the child support office in order to be eligible for Medicaid. Petitioner reminded K.H. to lie. (*Id.*

at 254.) K.H. told the child support officials that she did not need support, as she intended to give

the child up for adoption. (*Id.*) She also lied to the house parents at the home in Plymouth, telling

them that the father was Tim. (*Id.* at 256.) A couple of weeks later, her mother called her to tell her

that Petitioner had been arrested for domestic violence. Shortly thereafter, in January 2001, K.H.

told her mother that Petitioner had made her pregnant. (*Id.* at 237-38.) K.H. testified that she never

had sexual intercourse with anyone but Petitioner. (*Id.*) She gave the baby up for adoption

immediately after he was born. (*Id.* at 183.) She remembered that her blood was drawn at the

hospital, and she testified that she was aware that blood also was drawn from the baby's umbilical

cord. (*Id.* at 183-84.)

Pamela Harris, the mother of K.H., testified that she was the mother of two girls,

including K.H., and six boys. (*Id.* at 270-71.) She met Petitioner in 1988 in Chicago, and she

married him in 1999 in Berrien County, Michigan. (*Id.* at 272.) She lived with him at two addresses

in the Chicago area, one in Hazelcrest and one on South Morgan Street in Chicago. (*Id.* at 272-73.)

They lived at the Morgan Street address in 1992 to 1993, when K.H. was about 7 years old. (*Id.* at

273-74.) Harris moved from South Morgan Street in October 1993, because she was afraid that gang

members would return to hurt her or her children in retaliation for petitioner's shooting of a gang

member. She discussed witness protection with the police. (*Id.* at 286.) The family moved to her

parents' house briefly and then to Union Pier for about three months, after which they moved to South Fourth Street in Niles, Michigan in February 1994. (*Id.* at 274, 286-87.) In July and August, 2000, Petitioner started commenting that K.H. looked like she was gaining weight. It was Petitioner's idea to have K.H. take a pregnancy test. (*Id.* at 276-77.) In September, Harris gave K.H. a pregnancy test, after which K.H. told her that the baby's father had moved away. (*Id.* at 278.) Harris took K.H. to Plymouth, Indiana, where she could deliver her baby and then give it up for adoption. Harris did not tell her other children, and Petitioner did not go with her. K.H. subsequently told Harris that Petitioner had visited her on several occasions, but Harris had not previously known he was going. (*Id.* at 279-80.) K.H. finally told Harris that Petitioner was the father in February 2001, shortly before the baby was born on February 12, 2001. (*Id.* at 280-81.) Once K.H. told her, Harris asked her other children about what they had seen. Lance told her that he had seen something. (*Id.* at 383-85.) Harris did not want to know the details, but she wanted K.H. to tell the police. (*Id.* at 281.) K.H. arranged to talk to Detective Merriman, who went down to Plymouth to talk to her. (*Id.* at 282.) According to Harris, Petitioner worked as a truck driver, but only for short periods at a time before losing or quitting his job. The longest period he held a job was two years, but he did not work the entire time during those two years. (*Id.* at 348-52.) Harris drove trucks for multiple companies, working late night or overnight shifts. (*Id.* at 354-61.) Harris testified that Petitioner sometimes used names other than Samuel Calhoun, such as Terry Walker and Samuel Saffell. (*Id.* at 384.)

On cross-examination, Harris admitted that, in July or August 2000, under Petitioner's instruction, she had told Petitioner's attorney that she was a friend of Petitioner's, not his wife. She admitted that she had taken the stand and gave false answers to the attorney's

questions, in accordance with Petitioner's instructions.  (*Id.* at 288-89.)  In February 2001, after Petitioner went to jail, Harris talked to a prosecuting attorney, Jeffrey Taylor, about having lied.  (*Id.* at 292.)  Defense counsel explored in some detail Harris's false testimony in a prior proceeding. (Tr. II at 328-336.)  Harris testified that she had lied under oath because Petitioner had told her what to say and had threatened both her life and the lives of her children.  (*Id.* at 335, 366-67.)  Defense counsel also cross-examined Harris about the Niles property for which she had quit-claimed an interest to Petitioner and subsequently transferred the property to her children and herself, with a possible forgery of Petitioner's signature.  (*Id.* at 340-47, 363-65.)  Harris denied ever living with Petitioner's mother, Catherine Brody, though she stayed with her an unknown number of nights in 1990, when Petitioner was in jail.  (*Id.* at 391-92.)  Harris denied having any discussion with Petitioner's mother about the sexual abuse case.  Harris stated that Petitioner's mother was violent and that she had warned her children to watch out for her.  At one point, Harris made a written allegation that Brody carried a gun and had threatened to shoot her.  (*Id.* at 392-94.)  She also testified that Brody had pushed her in 1996.  (*Id.* at 399.)

Petitioner moved for a mistrial during Ms. Harris's testimony, because the prosecution failed to provide Petitioner a copy of a laboratory report authored by Paul Donald until just before trial.  The lab report, which contained the results of the analysis of Petitioner's DNA, had been directly sent to the statistical expert and not sent to the prosecutor or defense counsel until the beginning of trial. (Tr. I at 309-11.)  After defense counsel had the opportunity to review the report, the court heard further argument regarding the motion for mistrial.  (Tr. II at 402-415.)  The trial court denied the motion for mistrial.  (*Id.* at 417-18.)  After Donald testified, defense counsel renewed his request for a mistrial.  The court again denied the motion.  (*Id.* at 556-57.)

- 10 -

Dr. Curtis John Orr testified that he took care of K.H. during her pregnancy and delivered her son by Caesarean section on February 12, 2001. (*Id.* at 423.)  At the request of Niles City Police Detective Jim Merriman, he drew the baby's blood from the placenta into a purple-topped tube. (*Id.* at 423-24.)  He immediately delivered the tube of blood to Detective Merriman, who was in the waiting room. (*Id.* at 425.)

Angela Smith, previously Angela Miller, testified that she was the phlebotomist who drew K.H.'s blood sample at St. Joseph's Hospital in Plymouth, Indiana on February 12, 2001, while K.H. was in the post-surgical holding room. (*Id.* at 432-23.)  After she drew the blood into a purple-topped vial, she labeled it with K.H.'s name and handed it to Detective Merriman. (*Id.* at 434-35.)

Niles City Police Detective James Merriman testified that he had been with the department for 22 years and had been a detective for 8 years. (*Id.* at 441, 454-55.)  Officer Wanda Kurst took the initial police report and then advised Merriman that there was a female victim, whom she wanted Merriman to interview in Plymouth, Indiana. (*Id.* at 441.)  Prior to going to Plymouth, Merriman spoke briefly with Pamela Harris, who told him that K.H. would be willing to talk with him.  He interviewed K.H. on February 8, 2001, at the home in which she was staying. (*Id.* at 442-43.)  K.H. told Merriman that Petitioner was the person responsible for her pregnancy, and Merriman was under the impression that Petitioner had been sexually abusing her for as far back as she could remember. (*Id.* at 443.)  K.H. told him that the abuse began while she was living in Chicago. (*Id.* at 444.)  Merriman testified that K.H. told him that she had not had sexual relations with anyone other than Petitioner.  Merriman was notified that K.H. was going to have a Caesarean section on February 12, 2001, at approximately noon or 1:00 p.m.  He went down to Plymouth and was in the waiting room when Dr. Orr brought him the lavender or purple-topped tube containing the baby's

- 11 -

blood sample.  (*Id.* at 445.)  Shortly thereafter, he went to the nurse's station and advised that he needed a blood sample from K.H.  He then met up with Angela Miller, the phlebotomist.  (*Id.* at 446.)  He followed Miller and the nurse into a small office, and he waited for Angela Miller to bring him the lavender-topped blood vial, labeled as containing K.H.'s blood.  (*Id.* at 447.)  Merriman then returned to the Niles Police Station, where he packaged the vials separately and mailed them, on February 12 or 13, to the Michigan State Police (MSP) Crime Lab, together with a form requesting DNA testing.  (*Id.* at 447-48.)

On February 13, 2011, Merriman contacted Petitioner and read him his rights. Petitioner indicated that he would rather speak with his attorney.[4]  Merriman returned to Niles and handed the entire report to the prosecutor's office.  Two days later, the court issued an arrest warrant for Petitioner and a search warrant for Petitioner's blood.  (*Id.* at 449-50.)  Merriman arrested Petitioner on February 15, 2001, and, pursuant to the search warrant, blood was drawn from Petitioner into a lavender-topped vial.  Merriman then packaged and submitted the blood sample to the MSP Crime Lab.  (*Id.* at 450-51.)

Paul Donald, an employee of the MSP crime lab, was qualified as an expert in DNA analysis and forensic biology.  (*Id.* at 468, 476-77.)  Donald testified that the MSP crime lab was accredited by the American Society of Crime Lab Directors Laboratory Accreditation Board and that he participated in proficiency testing twice each year.  (*Id.* at 484-85.)  According to the crime lab's electronic records, the blood samples from K.H. and the infant were received on February 14, 2001, and Petitioner's blood sample was received on February 20, 2001.  (*Id.* at 500.)  On April 10, 2001,

---

[4]During a break in the next witness's testimony, defense counsel moved for a mistrial on the grounds that Merriman referred to Petitioner's exercise of his right to remain silent.  His motion was denied.  (*Id.* at 489-90.)

Donald retrieved the blood samples from the lab's freezer. He prepared some of the blood on DNA blood stain cards and obtained purified samples. (*Id.* at 501, 503.) He then tested the three purified samples. (*Id.* at 509.) He found obligate alleles (alleles specific to the mother and the father found in the child) from both K.H. and Petitioner in the infant's DNA. (*Id.* at 511.) In paternity cases, the MSP crime lab does not report a statistical estimate for the results, but instead refers the person requesting the result to a paternity geneticist to use the data generated in the lab. (*Id.* at 512-13.) He reported only that Petitioner could not be excluded as the father. (*Id.* at 524.) He faxed his results to Dr. Scarpetta on June 20, 2001. (*Id.* at 514.)

Dr. Marco Scarpetta of Scarpetta Forensic Consulting and Lifecodes testified as a biochemist specializing in paternity testing. (*Id.* at 536.) His laboratory is accredited by the American Association of Blood Banks, which has responsibility for accreditation of paternity testing laboratories. (*Id.* at 537.) Scarpetta was qualified as an expert in the area of genetic and paternity testing. (*Id.* at 539.) In his work, Scarpetta calculates a paternity index, which represents the odds in favor of paternity. (*Id.* at 542.) He also calculates a power of exclusion, representing the confidence level of the tests to exclude the suspected father. (*Id.* at 546.) In making his calculations in this case, Scarpetta used the DNA profile that was created at the MSP crime lab. (*Id.* at 548.) Based on Scarpetta's analysis, Petitioner could not be excluded as the father. (*Id.* at 549.) The cumulative paternity index showed that it was over three billion times more likely that Petitioner was the father than another man. (*Id.* at 551.) The strength of the tests conducted would exclude 99.9999997 percent of men who had been falsely accused of paternity. (*Id.* at 552.) Scarpetta testified that, based on a reasonable degree of scientific probability, Petitioner was the father of the infant. (*Id.* at 553.)

At the close of the prosecution's case, Petitioner moved for a directed verdict of acquittal. After summarizing the evidence on all elements of the charge, the Court denied the motion for directed verdict. (*Id.* at 572-73.)

The defense first presented the testimony of Catherine Walker Brody, Petitioner's mother. (*Id.* at 578-79.) Brody testified that Harris had stayed with her for three or four months in an unspecified year in the 1980s or mid-1990s, when Petitioner's eldest son was a baby. (*Id.* at 580.) During that time, Kortney, Jesse and Ramon were living with Harris, as was the baby, LaVay. (*Id.* at 581.) Brody denied ever pushing Harris and indicated that she could not even walk at that time. (*Id.* at 581.) She also denied carrying a gun, saying that guns frightened her. (*Id.* at 582.) Brody stated that she lived in Chicago and had only visited the family in Niles once, just after they had moved into their house in 1996. (*Id.* at 580, 584-85.) She last saw Harris on Thanksgiving of 1997, when the family came to Brody's house in Chicago. (*Id.* at 580, 582.)

Petitioner testified on his own behalf. (*Id.* at 587-621; Tr. III at 634-86.) During the time he lived in Chicago, Petitioner drove trucks over the road for periods of 2½ to 3 weeks at a time. (Tr. II at 592-93.) Petitioner described his many jobs driving trucks after he moved to Niles, Michigan. He drove all over the continental United States, Canada, and Mexico with Direct Transit, Trism, Northwestern, American Freight, and an individual in Plymouth, Indiana. (*Id.* at 594-99.) He denied ever having sexual relations with K.H. (*Id.* at 599.) He also testified that, more than 10 years before trial, he had an accident that crushed his testicle. As a result of the accident and related surgery, he had a very low sperm count. (*Id.* at 599-600, 610.) According to Petitioner, he owned the duplex in which he and Harris occupied both units. When he bought the property, he put another person's name on the deed, in order to protect his property in the event he had an accident while

- 14 -

driving that caused a lawsuit.  The name he put on the property was "Ashley Paulette Harris," whom

"Pamela Denise Harris" was purporting to be, in order to obtain the property.  Ashley Harris quit-

claimed the deed to Petitioner.  (*Id.* at 600-605.)  Petitioner asserted that the charges of sexual abuse

of K.H. were created in order for Pamela Harris and her daughter, Bridgette Gibson, to claim

Petitioner's house.  (*Id.* at 602, 604-05.)  Petitioner also testified that Pamela Harris forged his

signature to obtain a $100,000 insurance policy on Petitioner's life, making Harris the beneficiary.

(*Id.* at 605-07.)  Further, after Petitioner was arrested, Pamela Harris allegedly ran up thousands of

dollars in charges to his platinum and gold credit cards and made multiple ATM withdrawals at

$300.00 each.  Petitioner testified that, contrary to Harris's allegations, he worked regularly, while

she only worked sporadically.  (*Id.* at 611-12.)  Petitioner stated that Harris had never been married

to him, but is instead married to Samuel Saffell.  (*Id.* at 613.)  Petitioner disclaimed being Samuel

Saffell.  Petitioner testified that he had been born Tony Curtis Walker, but he had legally changed

his name to Samuel Calhoun, in order to have a chance at employment, because he had been to

prison for five years as the result of an armed robbery conviction when he was 18 years old.  (*Id.* at

615-16.)  Petitioner was charged with domestic violence, with respect to an incident in which Harris

came home drunk at 3:00 a.m. and argued with Petitioner, after which Petitioner put her in the tub

and threw cold water in her face.  (*Id.* at 618-20.)

On cross-examination, the prosecutor confronted Petitioner with a variety of utility

bills and property tax statements in the name of Samuel Saffell, at the address claimed to be owned

by Petitioner.  (*Id.* at 647-51.)  Similarly, the prosecutor confronted Petitioner with an application

to Tri-State Motor Transit Company by Samuel Saffell, naming Catherine Brody as his mother.  (*Id.*

at 654.)  Petitioner acknowledged that he had been charged with a crime in Utah and bonded out as

Samuel Saffell.  (*Id.* at 658.)  Petitioner also acknowledged a 1999 marriage license for Pamela Harris and Samuel Saffell that stated the same address for Samuel Saffell as the address Petitioner claimed as his.  Petitioner first explained that his cousin Samuel Saffell had lived with Harris and Petitioner at the time of the marriage.  (*Id.* at 660-61.)  He then changed his mind and denied living there at the time.  (*Id.* at 662.)

At the conclusion of trial, on July 27, 2001, the jury found Petitioner guilty of first-degree criminal sexual conduct.  (Tr. III, 742.)  On September 17, 2001, Petitioner was sentenced to life imprisonment.  (Sentencing Transcript, (S. Tr.), 26, docket #33.)

### B.     Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on May 20, 2002, raised the first four issues presented in his application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #26.)   By unpublished opinion issued October 1, 2003, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 10/21/03 Mich. Ct. App. Opinion (MCOA Op.), docket #41.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same four claims presented to and rejected by the Michigan Court of Appeals.  By order entered April 30, 2004, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* 4/30/04 Mich. Ord., docket #42.)

- 16 -

### C.        Post-conviction relief

On April 13, 2005, Petitioner filed a motion for relief from judgment pursuant to MICH. CT. R. 6.502 in the Berrien County Circuit Court, raising four additional grounds for relief, which are listed as grounds five through eight of the habeas petition: (1) Petitioner was denied due process when he was arrested on a factually insufficient warrant; (2) appellate counsel was ineffective in failing to raise the issues presented in the motion for relief from judgment and in failing to seek an evidentiary hearing on the ineffective assistance of trial counsel; (3) the prosecutor committed misconduct by failing to divulge pertinent evidence, specifically, the lab reports of DNA testing: and (4) Petitioner was convicted by a jury that was drawn from a venire in which minorities were constitutionally underrepresented.  The court denied the motion December 6, 2005, because Petitioner failed to demonstrate that appellate counsel was ineffective and therefore Petitioner failed to show good cause for having failed to raise his new issues on direct appeal, in violation of Mich. Ct. R. 6.508(D)(3)(b).  (*See* 12/6/05 Cir. Ct. Op. & Ord., docket #40.)  Petitioner sought leave to appeal in the Michigan Court of Appeals and Michigan Supreme Court.  The Michigan Court of Appeals denied Petitioner's application for leave to appeal on May 30, 2007, because Petitioner failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (5/30/07 Cir. Ct. Ord., docket #42.)  For the same reason, the Michigan Supreme Court denied leave to appeal on September 24, 2007.  (9/24/07 Mich. Ord., docket #43.)

On June 17, 2010, more than a year after he filed his habeas petition, Petitioner filed a second motion for relief from judgment (docket #34), raising one additional ground:  Petitioner was denied due process when his sentence was enhanced on the basis of a prior conviction in which Petitioner had been denied counsel.  In an order issued October 12, 2010 (docket #52), the Berrien

County Circuit Court denied the motion as an improper successive motion for relief from judgment, barred by Mich. Ct. R. 6.502(G)(2).  Petitioner did not file an application for leave to appeal to the Michigan Court of Appeals or the Michigan Supreme Court, undoubtedly because such an appeal is forbidden by Mich. Ct. R. 6.502(G)(1).

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  The Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme

Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–406). The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410. "[R]elief is available under §2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 2014 WL 1612424, at *4 (Apr. 23, 2014) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011)).

  Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Richter*, 131 S. Ct. at 784 (2011); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The

presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Richter*, 131 S. Ct. at 785 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.      Ineffective Assistance of Trial Counsel

In his first ground for habeas relief, Petitioner argues, as he did on direct appeal in the state courts, that his trial counsel was ineffective in numerous ways: (1) counsel failed to properly investigate the case and prepare for trial; (2) he failed to timely file necessary pretrial motions and elicited irrelevant and prejudicial testimony on cross-examination; (3) he failed to

ensure that the jury was properly instructed; and (4) he failed to provide any rational defense based on a sound trial strategy.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

To receive habeas relief on a claim of ineffective assistance of counsel, a petitioner must demonstrate that the state court's decision on the merits of that claim was contrary to or represented an unreasonable application of *Strickland*. *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002). As the Supreme Court recently has observed, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly"

deferential. *Richter*, 131 S. Ct. at 788 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009));

*see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011);

*Premo v. Moore*, 131 S. Ct. 733, 740 (2011). The question before the habeas court is "whether there

is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v.

Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again

underlined the difficult of prevailing on a *Strickland* claim in the context of habeas and AEDPA .

. . .") (citing *Richter*, 131 S. Ct. at 786). Where, as here, the state appellate courts decided

Petitioner's federal claims on their merits, the habeas court is restricted to the factual record

presented to the state courts in determining whether the state court's decision was contrary to, or

represented an unreasonable application of, the *Strickland* standard. *See Cullen v. Pinholster*, 131

S. Ct. at 1400-01.

Expressly applying the *Strickland* standard, the Michigan Court of Appeals

thoroughly analyzed Petitioner's claims as follows:

> On appeal, defendant challenges the effectiveness of his counsel on numerous
> grounds. Our review of defendant's ineffective assistance of counsel claim is limited
> to errors apparent on the record, because no Ginther[1] hearing was held below. *People
> v Williams*, 223 Mich App 409, 414; 566 NW2d 649 (1997). In order to prevail on
> a claim of ineffective assistance of counsel, a defendant must show that counsel's
> performance fell below an objective standard of reasonableness and that, but for
> counsel's errors, there is a reasonable probability that the result of the proceeding
> would have been different. *Strickland v Washington*, 446 US 668; 104 S Ct 2052;
> 80 L Ed 2d 674 (1984); *People v Stanaway*, 446 Mich 643, 687-688; 521 NW2d 557
> (1994). A defendant must affirmatively demonstrate that counsel's performance was
> objectively unreasonable and prejudicial to him. *People v Pickens*, 446 Mich 298,
> 303; 521 NW2d 797 (1994).

> A

> Defendant first argues that his counsel failed to properly prepare for trial.
> This claim is based on defendant's interpretation of certain events that occurred

before trial.  Specifically, defense counsel moved to adjourn trial on July 17, 2001.
The motion was denied at a hearing on July 18, 2001.  On the following day, defense
counsel filed four motions, three of which were based on information that defendant
provided on July 18, 2001, including that he previously treated with two doctors in
Illinois, that he believed these doctors could support his position that he was unable
to father a child, and that he was surprised by the DNA results, which were produced
by the prosecution approximately two weeks earlier.  Defendant moved to require the
prosecutor to obtain interstate subpoenas for the Illinois doctors, to order funds for,
and permit defendant to obtain, a medical examination to support his claim that he
could not father children, and to order a forensic examination.  The fourth motion
was to determine which of two pending first-degree criminal sexual assault cases
against defendant would be tried first.  In the latter motion, defense counsel pointed
out that both cases were set for trial on the same day.  Because the cases were not
formally consolidated, counsel argued that it would be prejudicial to try the cases
together and that defendant was entitled to know which case would be tried first.  On
July 24, 2001, the prosecutor's office clarified that the instant case would proceed to
trial first.  The trial court ultimately took responsibility for scheduling both cases on
the same day.

        The trial court denied the other three motions.  With respect to the medical
examination, the record revealed that defendant first raised issues about his ability
to father children only after receiving the DNA results.  Defendant failed to make an
offer of proof or otherwise factually support his position that a medical examination
would lead to probative evidence.  He relied on his bare allegations in this regard.
The trial court, noting that defendant had known for several months that the victim
had claimed that he was her baby's father, denied the motion as untimely.  The
motion for a forensic examination to determine defendant's competency was based
solely on defense counsel's subjective observations of defendant on July 18, 2001,
and was also denied.  At the hearing on the motion, the trial court noted that
defendant had been charged with two other crimes since May 2000, and that no
motion with respect to his competency had been raised in those cases.  Finally, the
trial court denied defendant's motion to order the prosecutor to obtain the interstate
subpoenas.  It did so after the prosecutor reiterated that no offer of proof or other
information about the doctors was provided by defendant.

        Defendant relies on the late filing of the motions, and the trial court's denial
of the motions, to argue that his counsel failed to properly prepare.  He suggests that
if counsel was better prepared, the motions would have been timely filed and may
have been granted.  We disagree.  The record is devoid of information concerning the
extent of counsel's preparation, the type of preparation, the total number of oral or
written communications between counsel and defendant before trial, and the quality
of those contacts.  Moreover, defense counsel could not have filed the motions at an
earlier time because the record indicates that he was not aware of defendant's alleged

- 23 -

medical condition before defendant revealed it to him on July 18, 2001, and it was not until that date that defense counsel observed the behavior that led to the motion for a forensic examination. More importantly, the record does not factually support that defendant was actually incompetent to stand trial or that a forensic examination was warranted. Similarly, the record does not factually support defendant's position that a medical examination or the testimony of the two out-of-state physicians would have supported defendant's theory that he was unable to father children. Defendant's arguments that the motions would have been granted if timely filed and that a different outcome would have resulted are based solely on defendant's unsupported assertions. Moreover, the record does not support defendant's allegation that counsel would have been better prepared if he had clarified earlier that this case would proceed on the scheduled trial date. Defendant has failed to demonstrate that counsel's trial preparation was objectively unreasonable or that, but for any alleged ill-preparation, there was a reasonable probability that the outcome of trial would have been different. *Stanaway, supra*.

As further support for our decision on this issue, we note that the record reveals that defense counsel was not ill-prepared or without strategy as defendant alleges on appeal. Counsel questioned the victim's credibility and that of her mother. He offered evidence to support the defense theory that the accusations were part of a plot by the victim's mother to obtain defendant's property. He also presented evidence disputing that the victim's mother was married to defendant as she claimed at trial. Additionally, defense counsel questioned the validity of the DNA statistics and argued that the DNA results were not infallible. He further argued that there was a chain of evidence problem with respect to the blood used in the DNA analysis. Counsel's assistance is not rendered ineffective because the chosen strategy ultimately fails. See *People v Kevorkian*, 248 Mich App 373, 414-415; 639 NW2d 291 (2001).

Defendant also argues that defense counsel's oral motion to withdraw immediately before trial began supports his theory that counsel was not prepared. Appointed counsel originally moved for an adjournment of trial on July 17, 2001, indicating that defendant's family had decided to retain counsel for defendant. He did not claim that there was any breakdown in the attorney-client relationship. At trial, after all of the other motions designed to cause delay were denied, defendant's appointed counsel orally moved to withdraw, making a nonspecific claim that there was a breakdown of the attorney-client relationship. If counsel was allowed to withdraw and trial was adjourned, defendant's family would have had the opportunity to retain the attorney they wanted to hire. The circumstances surrounding the motion suggest that it was made as a crafty attempt by counsel to secure an adjournment to please defendant after the other delaying tactics were unsuccessful. It does not support defendant's claim of lack of preparation.

- 24 -

B

Defendant next argues that he was prejudiced and denied a fair trial by alleged, outcome-determinative mistakes by counsel.  Defendant specifically complains about the manner in which counsel questioned witnesses, the collateral issues that counsel allowed to be introduced, counsel's failure to object to certain testimony about defendant's employment, counsel's failure to object or preclude information about defendant's other crimes, and counsel's decision to raise issues about a personal protection order that the victim's mother secured against defendant's mother.  Some of the challenged actions are improperly characterized or misunderstood by defendant on appeal.  More importantly, however, defendant has not met his burden of proof with respect to any of these claims.  While he lists the challenged conduct and cites numerous cases discussing the issue of ineffective assistance of counsel, he fails to explain or rationalize how any of the challenged actions affected the outcome of trial.  He generally concludes that the "record in the instant case is clear that counsel made serious mistakes that were outcome determinative."  "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims."  *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).  Further, the challenged actions generally involve matters of trial strategy, which this Court will not second-guess.  *People v Knapp*, 244 Mich App 361, 386 n 7; 624 NW2d 227 (2001).  "[E]ven if defense counsel was ultimately mistaken, this Court will not assess counsel's competence with the benefit of hindsight."  *Id.*, quoting *People v Rice (On Remand)*, 235 Mich App 429, 445; 597 NW2d 843 (1999).  More importantly, given the victim's testimony and the overwhelming DNA evidence, we cannot conclude that any of the challenged actions affected the outcome of the case.  Thus, defendant has not sustained his burden with respect to his claim of ineffective assistance of counsel.

[1]*People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

(MCOA Op. at 2-3, docket #41.)

The state-court's extensive analysis and findings on each of Petitioner's separate claims of ineffective assistance of counsel are patently reasonable and require little supplemental discussion.  The state court properly concluded that defense counsel vigorously litigated the issues in question.  According to Petitioner's own brief, counsel filed five separate motions between July 17 and 19, 2001, seeking to adjourn trial, to obtain a medical examination, to obtain a forensic examination, to subpoena out-of-state witnesses, and to determine which case was being tried.  The

trial court accepted responsibility for the lack of clarity with respect to the case being tried.  In addition, the mere fact that defense counsel was unsuccessful on his motions does not demonstrate that the attorney was ineffective.

Further, Petitioner's own habeas brief suggests that trial counsel was only provided the DNA expert's statistical report a few weeks before trial and that counsel acted promptly to seek an adjournment and to object to admission of the documents at trial.  (Pet'r's Br. in Supp. of Pet., docket #2, Page ID #35.) Petitioner also admits in his brief that he did not advise his attorney that he had a medical condition that rendered him incapable of impregnating a woman until one week before trial, despite having known that he was accused of impregnating his step-daughter for months. (*Id.*)  Further, Petitioner has at no time alleged that he was incapable of producing sperm, only that his prior injury and resulting surgery caused him to have a low sperm count.  (Tr. III at 672-77.)  The fact that counsel did not succeed in obtaining a medical expert therefore could not have been prejudicial, as it would not disprove the DNA evidence.  However few sperm Petitioner produced, they were sufficient to cause his step-daughter's pregnancy.

Petitioner next claims that his attorney was ineffective in failing to challenge his competency sooner.  A criminal defendant who is incompetent may not be tried.  *Godinez v. Moran*, 509 U.S. 389, 396 (1993); *Drope v. Missouri*, 420 U.S. 162, 171 (1975).  The test for a defendant's competency to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 411 (1960); *see also Godinez*, 509 U.S. at 396; *United States v. Denkins*, 367 F.3d 537, 547 (6th Cir. 2004) (quoting *United States v. Ford*, 184 F.3d 566, 580 (6th Cir. 1999)).  A court's failure to hold a proper

hearing where substantial evidence exists of the defendant's incompetency violates the defendant's due process right to a fair trial. *Mackey v. Dutton*, 217 F.3d 399, 411 (6th Cir. 2000). "[T]he standard . . . for requiring competency hearings prior to trial or the entry of a guilty plea is not merely whether extant evidence raises 'doubt' as to the defendant's capacity to stand trial, but rather whether evidence raises a 'bona fide doubt' as to a defendant's competence." *Warren v. Lewis*, 365 F.3d 529, 533 (6th Cir. 2004). In reaching its determination regarding competency, a court should consider evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion concerning his competence. *Mackey*, 217 F.3d at 411.

According to Petitioner's own brief, counsel could not have filed the motion challenging his competency sooner, because counsel only became aware of facts suggesting a basis for a competency hearing on July 18, 2001, when he interviewed Petitioner at the jail. (Pet'r's Br. in Supp. of Pet., docket #2 at 8.) Counsel filed a motion seeking a forensic examination the next day. Although Petitioner argues that counsel could have visited him sooner and therefore could have discovered his lack of competency, Petitioner provides no evidence that he lacked competency prior to that time.

Moreover, as the state-court expressly found, nothing in the record suggests that Petitioner lacked the requisite competency either in the instant case or in two other cases that were pending at the time of trial. That finding is entitled to a presumption of correctness, 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656, which Petitioner is required to overcome by clear and convincing evidence. Petitioner has never attempted to make such a showing. Indeed, Petitioner's own testimony at trial demonstrates that he fully understood what was happening and was more than able to assist in his own defense. Even in his habeas petition, Petitioner fails to

- 27 -

provide any factual basis for his claim that he lacked competency.  For all these reasons, the state court clearly acted reasonably in rejecting Petitioner's claim of ineffective assistance of counsel with respect to Petitioner's lack of competency.

In addition, despite Petitioner's claim that defense counsel was unprepared and failed to pursue a reasonable trial strategy, counsel's strategy was well-developed and thorough. Counsel engaged in extensive cross-examination and impeachment of witnesses to undermine their credibility, proffered a motive for their accusations, challenged the DNA evidence and the chain of custody of the DNA, objected to the jury array, and moved for a mistrial on several occasions during trial because the DNA analysis had not been provided in a timely fashion.  Far from being ineffective, counsel was highly skilled and vigorously pursued a reasonable defense strategy designed to undermine the credibility of the substantial evidence against Petitioner.

Finally, Petitioner states in passing that his attorney failed to properly investigate the case.  It is well established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'"  *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland,* 466 U.S. at 690). This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence.  *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*,

528 U.S. 470, 481 (2000); accord *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004).  A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them."  *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).

Petitioner fails entirely to identify what investigation trial counsel should have conducted that he did not.  As the Sixth Circuit has recognized, "[i]n the bulk of our failure-to-investigate cases, the record shows that counsel has either completely failed to investigate a potential witness . . . , or the record shows that had the attorney taken some investigatory steps he or she would have discovered additional crucial information."  *Hale v. Davis*, 512 F. App'x 516, 521 (6th Cir. 2013).  Petitioner identifies no witness that should have been interviewed or other investigatory step that should have been taken by defense counsel.  As a consequence, and in light of the state-court's express findings that counsel did not learn of the DNA evidence or of Petitioner's physical and mental condition until immediately before trial, Petitioner's conclusory allegation that counsel failed to investigate is wholly unsupported.

In sum, Petitioner has identified no error in the state-court's legal reasoning or factual findings. He merely argues that the state courts and the jury should have believed his own version of events.  In light of the evidence, and applying the doubly deferential standard applicable to the state-court's determinations on habeas review, *see, e.g. Titlow*, 134 S. Ct. at 13; *Pinholster*, 131 S. Ct. at 1403, Petitioner has demonstrated no basis for granting relief on his first habeas ground.

II.     Trial Court's Abuse of Discretion

In his second ground for habeas relief, Petitioner argues that the trial court abused its discretion and committed reversible error by denying the motion to adjourn and the motion of

- 29 -

defense counsel to withdraw to substitute a new attorney. He also argues that his other motions seeking both medical and forensic examinations should have been allowed, which, he argues, also would have necessitated the adjournment of trial.

The Michigan Court of Appeals again carefully considered Petitioner's claims on direct review:

> Next, defendant appeals the trial court's denial of counsel's oral motion to withdraw on the morning of trial. When reviewing a trial court's decision to deny a defense counsel's motion to withdraw and to grant a continuance to secure other counsel, several factors must be considered:
>
>> (1) whether the defendant is asserting a constitutional right, (2) whether the defendant has a legitimate reason for asserting the right, such as a bona fide dispute with his attorney, (3) whether the defendant was negligent in asserting his right, (4) whether the defendant is merely attempting to delay trial, and (5) whether the defendant demonstrated prejudice resulting from the trial court's decision. [*People v Echavarria*, 233 Mich App 356, 369; 592 NW2d 737 (1999).]
>
> The trial court's decision will not be disturbed absent an abuse of discretion. *People v Traylor*, 245 Mich App 460, 462; 628 NW2d 120 (2001).
>
> An indigent defendant is guaranteed the right to counsel; however, he is not entitled to have the attorney of his choice appointed simply by requesting that the attorney originally appointed be replaced. Appointment of a substitute counsel is warranted only upon a showing of good cause and where substitution will not unreasonably disrupt the judicial process. Good cause exists where a legitimate difference of opinion develops between a defendant and his appointed counsel with regard to a fundamental trial tactic. [*Id.*, citing *People v Mack*, 190 Mich App 7, 14; 475 NW2d 830 (1991).]
>
> After arguing the pretrial motions and one additional oral motion, defense counsel stated:
>
>> Second, and more importantly, your Honor, I talked to my client this morning and basically he indicated to me that our conversation was going nowhere, that we didn't want it to break down into a full argument type thing, but it's my opinion that the lawyer/client – or the lawyer/client relationship

is totally destroyed in this case. And I'm not prepared to represent my client
in this situation where we have no relationship anymore.

The trial court questioned defendant about why there was no longer a relationship.
Defendant answered, "I don't know." He complained that he could not raise certain
issues with counsel in a timely manner because he was not in contact with counsel.
He subsequently complained about appointed counsel's representation in an unrelated
matter and about a bond issue that he had discussed with counsel four months earlier.
The trial court indicated that it was responsible for the bond and that it had listened
to counsel's argument on the matter. Defendant then conceded that he was not
blaming counsel for the bond, but he generally indicated that the representation was
not "up to his expectations." He felt that counsel was not acting in his best interests.
In support, he stated that he believed counsel filed the pretrial motions in a tardy
manner. Defendant further expressed a belief that no one, including the court, was
giving him the presumption of innocence. Like defendant, defense counsel also
failed to articulate any concrete reason to support the motion to withdraw. The trial
court denied the motion, noting that there are many times when an attorney and his
client do not see "eye to eye." Contrary to defendant's claim, we conclude that the
trial court thoughtfully considered the issue, asked questions, and did not abuse its
discretion in denying the motion.

While we accept that defendant was asserting his constitutional right to
effective counsel when he joined in appointed counsel's motion to withdraw, the
record does not support the existence of a legitimate reason for withdrawal. Neither
defendant nor counsel articulated a difference of opinion with regard to a
fundamental trial tactic. The stated reasons in support of the motion were vague. A
defendant's vague allegation that he lacks confidence in trial counsel is insufficient
to support a claim that substitution is warranted. *Traylor*, *supra* at 463. Likewise,
general unhappiness with representation is insufficient. See, e.g., *Traylor*, *supra*,
wherein this Court noted that a defendant's filing of a grievance against his counsel
is insufficient alone to warrant new counsel. Here, there was no bona fide dispute
that supported a finding of good cause to allow appointed counsel to withdraw and
permit a continuance while defendant retained other counsel. *Echavarria*, *supra* at
369.

We acknowledge that defendant specifically articulated displeasure with the
late filing of motions. As previously discussed, however, he has not shown that he
was prejudiced because counsel filed the motions eight days before trial. *Traylor*,
*supra*. Nor has he demonstrated that the motions were meritorious and would have
been granted if timely filed. Similarly, defendant's general allegation that there was
a lack of communication was insufficient to justify the motion to withdraw and grant
a continuance. The record supports that, at a minimum, defense counsel met with
defendant four months before trial and engaged in discussions. As soon as he

- 31 -

received the DNA results, he forwarded them to defendant. Shortly thereafter, on July 18, 2001, defense counsel spent a "significant" amount of time with defendant at the Berrien County Jail.  He had obviously spoken with defendant or his family before that time because he filed the motion to adjourn on July 17, 2001.  There was no evidence that defendant attempted to communicate with defense counsel at any time and was ignored, or that additional communication was necessary or would have been fruitful before the DNA results were received.  In sum, there was no showing that the communications were insufficient or that a lack of communication resulted in a bona fide dispute between counsel and defendant.  Accordingly, there was no good cause for withdrawal.

Finally, we also conclude that defendant has not demonstrated that he was prejudiced by the trial court's denial of counsel's motion to withdraw.  Counsel provided a defense, crossexamined witnesses, raised doubt about the credibility of the victim's mother, raised issues with respect to the victim's credibility, questioned the statistical reliability of the DNA paternity results, and even managed to have the trial court strike an habitual offender notice on a procedural ground.  Furthermore, as previously noted, the motion to withdraw appears to have been made as an attempt by counsel to satisfy the desire of defendant and his family to retain counsel of their own choosing, a decision that was made by them only after receiving the DNA results.  The denial of the motion was not an abuse of discretion.

. . .

Defendant further argues that the trial court failed to properly exercise its discretion with respect to the pretrial motions because it did not deny them on the merits, but because they were untimely.  Defendant argues that the pretrial motions were motions for a continuance to obtain a medical examination, to obtain a forensic examination, and to subpoena certain witnesses.  He argues that, as such, they were improperly denied because he met the criteria to obtain a continuance. *Echavarria*, *supra*. Specifically, defendant contends that he was asserting his constitutional right to present a defense or avoid trial, if found to be incompetent.  He also contends that he had legitimate reasons for seeking a continuance, was not negligent in seeking it, and was prejudiced by the trial court's decision to deny it.  We disagree.  Defendant was negligent in failing to raise these issues earlier, and circumstances suggested that the motions were made to delay trial.  Defendant was aware that he had been accused of fathering the victim's baby months before he brought the medical matter to his attorney's attention.  Moreover, he has failed to offer factual support for his position that a medical examination, a forensic examination, or the production of out-of-state witnesses would have assisted his case in any way.  He relies only on his self-serving statements in this regard.  Further, nothing in the record otherwise supports defendant's claim that a forensic examination was warranted.  The motion was based

on counsel's subjective observations only.  For these reasons, we conclude that the
trial court did not abuse its discretion when it denied the motions.

(MCOA Op. at 5-6, docket #41.)

　　　　To the extent that Petitioner seeks relief based on the state standard for adjournment

articulated in *People v Echavarria*, 592 NW2d 737, 744 (Mich. Ct. App. 1999), his claim is not

cognizable on federal habeas review.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v.*

*McGuire*, 502 U.S. 62, 68 (1991).  The extraordinary remedy of habeas corpus lies only for a

violation of the Constitution.  28 U.S.C. § 2254(a).  The decision of the state courts in applying state

law is binding on a federal court.  *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983).

　　　　With respect to his constitutional claims, Petitioner asserts that the denial of his

motion to adjourn the trial and to permit the hiring of retained counsel violated his rights under the

Due Process Clause and the Sixth Amendment.  The Sixth Amendment provides a criminal

defendant with the right "to have the Assistance of Counsel for his defense."  U.S. Const., amend.

VI.  One element of that right is the right to have counsel of one's choice.  *See United States v.*

*Gonzalez-Lopez*, 548 U.S. 140, 148 (2006).  However, the right to counsel of choice is not without

limits.  *Id.* at 148; *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007).  "[T]he right to

counsel of choice does not extend to defendants who require counsel to be appointed for them."

*Gonzalez-Lopez*, 548 U.S. at 151 (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988), and

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989)).  "'An indigent defendant

has no right to have a particular attorney represent him and therefore must demonstrate "good cause"

to warrant substitution of counsel.'"  *Mooneyham*, 473 F.3d at 291 (quoting *United States v. Iles*, 906

F.2d 1122, 1130 (6th Cir. 1990)); *see also Caplin & Drysdale*, 491 U.S. at 624 ("[T]hose who do

- 33 -

not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts.").  Thus, where a court is faced with a defendant's request to effect a change in his representation by way of a motion to substitute counsel, the court must determine whether there is good cause for the substitution by balancing "the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice."  *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996).

Nonetheless, a criminal defendant who can afford his own attorney has the qualified right to his chosen attorney.  *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1351 (6th Cir. 1993); *see also Burton v. Renico*, 391 F.3d 764, 771-72 (6th Cir. 2004) (holding that "a defendant has a right to a '*fair opportunity* to secure counsel of his own choice'") (emphasis in original) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)).  The decision on this type of motion traditionally lies within the discretion of the trial judge, and not every denial violates due process, even if the party fails to offer evidence or is compelled to defend without counsel.  *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).  Thus, "[d]enial of a continuance to secure counsel rises to the level of a constitutional violation only when there is an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Murray v. Slappy*, 461 U.S. 1, 11-12 (1983) (internal quotations omitted).  There are no "mechanical tests" for deciding when the denial is so arbitrary as to violate due process; rather, the Court must look to the circumstances of the case, particularly in the reasons presented to the trial judge at the time the request is denied.  *Ungar*, 376 U.S. at 589.  "Absent proof of a violation of a specific constitutional protection, a habeas petitioner must show that a trial error was so egregious as to deprive him of a fundamentally fair adjudication, thus violating constitutional principles of due process."  *Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003); *see also Landrum*

*v. Mitchell*, 625 F.3d 905, 927 (6th Cir. 2010).  In addition, "[t]o demonstrate reversible error, the defendant must show that the denial resulted in actual prejudice to his defense." *United States v. King*, 127 F.3d 483, 487 (6th Cir.1997) (internal quotation marks and citation omitted).  "Actual prejudice may be demonstrated by showing that additional time would have made relevant witnesses available or otherwise benefited the defense."  *Powell*, 332 F.3d at 396.

In the instant case, Petitioner can demonstrate neither fundamental unfairness nor prejudice.  The request for adjournment was principally based on Petitioner's effort to mortgage Petitioner's mother's home in order to raise funds to replace appointed counsel with retained counsel.  Although Petitioner had been charged for five months before the trial date, he had only initiated his attempts to raise money to retain counsel shortly before trial.  At the time of trial, the mortgage had not been finalized, so funds were not yet secured.  Petitioner therefore was not yet in a position to employ retained counsel, and the court had no obligation to continue the matter for an indefinite period so that Petitioner could continue his last-minute effort to raise funds.  The trial court, in denying the motion, expressly concluded that Petitioner had had months in which to retain counsel, but had only begun to make an attempt to raise money for that purpose shortly before trial. The trial court's conclusion was a factual determination entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1);  *Lancaster*, 324 F.3d at 429.

Further, Petitioner's argument that the trial court improperly denied his motion to adjourn so that he could obtain medical and forensic witnesses is without merit.  No evidence exists that additional witnesses were either available or necessary to the defense.  In fact, according to Petitioner's own testimony at trial, those witnesses, at most, would have been able to corroborate Petitioner's testimony that his sperm count was very low – not that he produced no sperm.   In

addition, Petitioner can point to no facts suggesting that he required a forensic expert or that he lacked competency to stand trial. Moreover, the trial court properly was concerned with the fact that the victim would soon be returning to school, causing difficulties in the trial of the action. (*See* Tr. of Hr'g on Mot. to Adjourn at 4-5, docket #28.) All of these strongly support the conclusion that the trial court acted reasonably denying the motions to adjourn, to allow substitute counsel, and to obtain medical and forensic witnesses.

In any event, Petitioner cannot demonstrate that he was prejudiced by the denial of his motions. As fully discussed with respect to Petitioner's first habeas claim, the state court reasonably concluded that appointed counsel provided constitutionally effective assistance. Further, although Petitioner argues that he had irreconcilable differences with his appointed counsel, the Michigan Court of Appeals expressly found that Petitioner had failed to demonstrate the substance of that claim. (*See* 10/21/03 MCOA Op. at 5, docket #41.) Neither Petitioner nor his attorney could identify the nature of their dispute. As the court of appeals held, Petitioner's claims of significant difference of opinions were vague and unsubstantiated. That factual conclusion is entitled to deference, *see* 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656, and even now, Petitioner has failed to show that the finding was clearly and convincingly erroneous. *Id.*

In sum, Petitioner's claims in this regard are principally state-law claims that fall within the trial court's discretion. To the extent that federal issues are involved, the trial court's decisions to deny the motions to adjourn, to withdraw appointed counsel, and to allow substitution of retained counsel constituted entirely reasonable applications of established Supreme Court precedent.

III.    Prosecutorial Misconduct

In his third ground for habeas relief, Petitioner argues that the prosecutor committed misconduct in multiple ways:  by vouching for the truthfulness of her witnesses; denigrating the defense and defense counsel; appealing to civic duty and sympathy for the victim; arguing facts not in evidence; and misrepresenting the applicable law.   The Michigan Court of Appeals concluded that the claims were not preserved because Petitioner did not lodge a contemporaneous objection.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547

U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.  The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default.  *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).  The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claims.  It is clear that the contemporaneous objection rule was well established at the time of Petitioner's trial.  *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985). Moreover, a rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy."  *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule requiring a contemporaneous objection caused Petitioner to default his claims in state court.  *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011; *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).  Where, as here, the state court reviews the issue for plain error, the failure to object is still considered a procedural default.  *See Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (holding that "plain error review does not constitute a waiver of state procedural default

rules"); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *see also Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (same under review for "manifest injustice").

Because Petitioner's claim is procedurally barred, he must demonstrate either cause excusing his default and actual prejudice or that the lack of habeas review will result in manifest injustice. *See House*, 547 U.S. at 536. As cause excusing his default, Petitioner argues in his habeas brief that his attorney was ineffective in failing to object to the prosecutor's misconduct. To serve as cause sufficient to excuse a procedural default, a claim of ineffective assistance of counsel must itself be properly exhausted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell*, 274 F.3d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001). While Petitioner argued on direct appeal that his attorney was ineffective for multiple other reasons, he never argued in the state courts that his trial attorney was ineffective in failing to object to the prosecutor's alleged misconduct. Because his claim of ineffective assistance of trial counsel is defaulted, Petitioner cannot show that the ineffective assistance of counsel excuses his procedural default of the contemporary-objection rule. *Id.*

Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Regardless, Petitioner cannot show prejudice for his default. The prejudice prong requires the Petitioner to show that the alleged error "worked to his *actual* and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "'[T]he prejudice component of the cause and prejudice test is not satisfied if there is strong evidence of Petitioner's guilt and a lack of evidence to support his claim.'" *Perkins*, 58 F.3d at 219 (quoting *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994)). In

the instant case, the evidence against Petitioner -- including the victim's testimony about the sexual assault, her resulting pregnancy, and the DNA match of the child to both the victim and Petitioner -- was overwhelming.

Finally, Petitioner provides absolutely no new evidence concerning his actual innocence.  He therefore cannot demonstrate manifest injustice caused by the default.[5]

IV.   Failure to Give Jury Instructions & Related Ineffective Assistance

Petitioner argues that the jury should have been given a cautionary instruction concerning the victim's testimony about multiple uncharged acts of criminal sexual conduct committed by Petitioner prior to the act that caused the victim's pregnancy.  As a subsidiary argument, he contends that trial counsel was ineffective in failing to object to the trial court's instruction on this issue.

To the extent that Petitioner complains that the jury should not have considered the uncharged acts as propensity evidence, he fails to raise a constitutional claim.  There is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process. *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it did not need to reach the issue,

_____

[5]Because of the procedural default, I decline to discuss in detail the merits of Petitioner's prosecutorial-misconduct claims.  Nevertheless, I have reviewed both the alleged errors and the lengthy and detailed opinion issued by the Michigan Court of Appeals with respect to the issue.  Although some small portions of the prosecutor's argument were improper, the state court reasonably concluded that the argument did not rise to the level of prosecutorial misconduct.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (holding that for relief to be granted, the prosecutorial misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  As a result, the state court's rejection of Petitioner's claim of prosecutorial misconduct constituted an entirely reasonable application of clearly established Supreme Court precedent.

it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n.5. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Moreover, a claim that a trial court gave an improper jury instruction is not typically cognizable on habeas review. Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). *See also Estelle*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (same); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

The Michigan Court of Appeals gave short shrift to Petitioner's complaint about the jury instruction, and it summarily rejected Petitioner's claim that counsel was ineffective in failing to object:

> Defendant additionally argues that the trial court erred by failing to instruct the jury using CJI2d 20.28, a cautionary instruction explaining how the jury should consider uncharged acts of criminal sexual conduct about which the victim testified. This argument is not preserved because there was no objection to the instructions as given. *People v Gonzalez,* 256 Mich App 212, 225; 663 NW2d 499 (2003). Therefore, we review this unpreserved instructional issue for plain error affecting defendant's

substantial rights.  *Id.*  In a cursory argument, defendant contends that the parties and the trial court were in agreement that CJI2d 20.28 would be read to the jury, that it was not read, and that the trial court was "duty bound to explain to the jury" the manner in which the evidence could be evaluated.  Because defendant improperly fails to cite any authority to support his position, we deem this issue abandoned.  *Kelly, supra; People v Connor,* 209 Mich App 419, 430; 531 NW2d 734 (1995).  Nevertheless, we hold that defendant has not demonstrated plain error requiring reversal. Neither party disputes that there was a plain error where the trial court failed to give the relevant and agreed-upon instruction.  However, defendant has not demonstrated that the omission affected the outcome of trial.  *Carines, supra.*  The instructions pertaining to the essential elements of the crime were proper and the evidence in support of defendant's conviction beyond a reasonable doubt was overwhelming.  Thus, reversal is not required.  We additionally reject defendant's argument that counsel was ineffective for failing to insure that the instruction was given. Defendant has not demonstrated that, but for counsel's conduct, the outcome of the trial would have been different.  *Stanaway, supra.*

(MCOA Op. at 9.)  The state-court's determination that any error was not prejudicial was patently reasonable.  As the state court noted, the prosecutor presented overwhelming evidence that Petitioner had sexually abused his 14-year-old step-daughter and had caused her to become pregnant and deliver Petitioner's child.  In light of these facts, the absence of an instruction about earlier abuse could not have caused prejudice.

      Finally, Petitioner makes a vague argument that counsel was ineffective in failing to seek other cautionary instructions, particularly an instruction concerning the use of impeachment evidence.  The court of appeals summarily rejected the argument:

> Finally, defendant argues that counsel was ineffective for failing to request CJI2d 4.11, a cautionary instruction explaining how the jury should consider evidence of other offenses, and CJI2d 4.5, a cautionary instruction addressing impeachment by prior inconsistent statements.  Defendant's conclusory argument includes no assertion that counsel's failure to request these instructions affected the outcome of trial.  Defendant simply represents that he would have benefited from the instructions.  Because he does not argue or offer support for his position that, but for counsel's failure to request the instructions, the outcome of trial would have been different, his claim of ineffective assistance of counsel fails.  *Stanaway*, *supra.*

(MCOA Op. at 9-10.)

- 42 -

The state-court's determination is entirely reasonable under established Supreme Court precedent.   As previously discussed, to demonstrate that counsel was constitutionally ineffective, Petitioner must demonstrate that the attorney's failure caused actual prejudice. *Strickland*, 466 U.S. at 687-88.  Petitioner has not even attempted to make that showing, and, on the record evidence, he could not do so.   I therefore recommend that Petitioner's fourth ground for habeas relief be denied.

V.      <u>Illegal Arrest</u>

In his fifth ground for habeas relief, Petitioner contends that his conviction is invalid because his arrest was based on a form warrant, rather than on individualized, fact-specific allegations sufficient to support probable cause.  Petitioner raised the issue in his first motion for relief from judgment.   The Berrien County Circuit Court did not review the merits of any of Petitioner's claims on collateral review, except the claim that appellate counsel was ineffective for failing to raise the other claims on direct appeal.   Finding that appellate counsel was not ineffective, the court denied the motion under Mich. Ct. R. 6.508(D)(3), holding that Petitioner had failed to demonstrate cause for failing to raise the issue on direct appeal and prejudice resulting from that failure.  (12/6/05 Cir. Ct. Ord., docket #40.)

This claim is clearly procedurally defaulted.  Nevertheless, the United States Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner,

- 43 -

whereas the procedural-bar issue involved complicated issues of state law.")).  I therefore will proceed directly to the merits of Petitioner's claim.

An illegal arrest does not provide a basis for habeas corpus relief from an ensuing conviction.  *See Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) (illegal arrest or detention does not void a subsequent conviction).  The method by which a petitioner's presence was procured at trial does not provide a basis for invalidating his criminal conviction.  *See Immigration & Naturalization Serv. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984) ("The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred.");  *Frisbee v. Collins*, 342 U.S. 519, 522 (1952); *Ker v. Illinois*, 119 U.S. 436, 444 (1886); *Browning v. Jabe*, No. 88-1307, 1990 WL 6943, at * 1 (6th Cir. Feb. 1, 1990) ("petitioner's arguments that his arrest was absent probable cause . . . [are] irrelevant, as an unlawful arrest is not a defense to a valid conviction.") (citing *United States v. Crews*, 445 U.S. 463, 474 (1980)).  Accordingly, Petitioner's claim of illegal arrest cannot serve as a basis for habeas relief.

VI.    Prosecutorial Misconduct in Withholding Evidence and Insufficiency of the Evidence

Petitioner argues in his seventh ground for habeas relief, as he did in his first motion for relief from judgment, that the prosecutor committed misconduct by withholding the DNA evidence and by presenting insufficient evidence to convict Petitioner.  Because the claim is without merit, I will disregard the procedural default for purposes of this Report and Recommendation.  *See Lambrix*, 520 U.S. at 525; *Hudson*, 351 F.3d at 216.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court.  *See id.* at 12-13;  *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

Petitioner's claim falters on the first step of analysis under AEDPA -- a petitioner must ground his claim on clearly established federal law, as enunciated by holdings of the Supreme Court.  28 U.S.C. § 2254(d).  The Court has clearly stated that criminal defendants have no constitutional right to discovery.  *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).  Any right to pretrial disclosure of expert witness reports is a pure matter of state law.  The Court has held that a prosecutor may not suppress favorable *exculpatory* evidence.  *Brady v. Maryland*, 373 U.S. 83 (1963).  The *Brady* rule is not violated, however, by a failure to disclose *inculpatory* evidence, which the DNA report clearly was.  *See United States v. Agurs*, 427 U.S. 97, 109-10 (1976); *accord United States v. Macias-Farias*, 706 F.3d 775, 780 (6th Cir. 2013).  Simply put, the Supreme Court has

never held that a prosecutor violates constitutional rights by failing to disclose a completely damning laboratory report until shortly before trial.  In such circumstances, AEDPA precludes relief.  *See Parker*, 132 S. Ct. at 2155-56

Assuming that some constitutional right is implicated by the facts of this case, Petitioner has failed to show that the prosecutor's conduct denied him due process.  On the first afternoon of trial, defense counsel moved for a mistrial, alleging that the delays in receiving the DNA evidence, together with some confusion about whether DNA samples were taken twice, violated his client's right to a fair trial.  (Tr. I at 308-09, 310-14; Tr. II at 402-016.)  The trial court denied the motion, specifically finding that the prosecutor had not hidden the results of Paul Donald's preliminary DNA analysis.  The trial court also found that the prosecutor had, at least orally, shared the results with defense counsel, but she had not herself received a printed version until the first morning of trial.  (Tr. II at 417.)

The trial court's factual findings are entitled to a presumption of correctness, which can only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  Petitioner has not even attempted to make such a showing. Moreover, on the facts of the case, those findings were patently reasonable.  The record is  replete with evidence, including evidence conceded by the defense, that the prosecutor did not intentionally delay the delivery of the DNA analysis to defense counsel.

First, defense counsel filed a motion to adjourn and a motion seeking interstate subpoenas two weeks before trial began.  (*See* 7/17/01 Mot. to Adjourn, docket #35; 7/17/01 Mot. Seeking Subpoenas, docket #37.)  The substance of the motions makes it clear that counsel not only learned of the preliminary DNA results weeks before the trial began, but also had received Dr. Marko

- 46 -

Scarpetta's report, in writing, some weeks before trial.  In fact, at the oral argument on his motions, defense counsel made the following representation:

> We have not had a lot of communication to prepare for this.  When I talked to him this morning, we did discuss the DNA results that I had sent to him a couple of weeks ago when I actually received them.  I sent him a copy almost immediately.  And he has some real questions about that.  And I think that needs to be further investigated as well.

(7/18/01 Tr. Mot. to Adjourn at 6.)  That admission demonstrates that the prosecutor did not intentionally withhold the results.

Second, at the time Petitioner moved for a mistrial, defense counsel acknowledged that he was aware that the preliminary results had been compiled and were being sent directly to Dr. Scarpetta from the MSP crime lab.  (Tr. II at 402-04, 413.)  In fact, defense counsel acknowledged that he had approved having the preliminary results forwarded directly to Dr. Scarpetta, in order to speed up the final DNA report.  (*Id.* at 401-03, 413.)  Defense counsel represented that he was aware of the preliminary report that Petitioner's DNA could not be excluded, which was the content of Donald's report, but that he was not aware that a written report existed before trial began.  (*Id.* at 413.)  The trial court specifically found that the prosecutor had orally disclosed to defense counsel both the preliminary DNA results and the identity of the DNA analyst, Paul Donald, but Petitioner had never requested Donald's report.  (Tr. II at 416-17.)  The trial court also found that Scarpetta, as an expert, was permitted to testify without disclosing prior to trial the facts on which he had relied, including Donald's report.  Scarpetta and his report both had been properly released some weeks before trial.  (*Id.*)

In sum, the facts on the record demonstrate that the trial court's factual findings were entirely reasonable, and Petitioner has failed to overcome the presumption of correctness afforded those findings.

Finally, Petitioner can demonstrate no prejudice that could have flowed from the delay in his receipt of Donald's report.  Petitioner never argued that he intended to hire an expert who could contradict Donald's analysis of the DNA.  In addition, Petitioner did not dispute that Dr. Scarpetta was entitled to rely on Donald's report in conducting his statistical analysis, regardless of Donald's independent testimony.  Further, defense counsel engaged in a thorough cross-examination of both Donald and Scarpetta consistent with Petitioner's theory of the case.  For all these reasons, Petitioner fails to show that he was prejudiced by the delay in receiving Donald's report.

VII.   <u>Fair Cross-Section in the Jury Venire</u>

Petitioner argues, as he did in his first motion for relief from judgment, that he was denied his rights under the Sixth Amendment to a jury drawn from a fair cross-section of the community.  Ignoring the procedural default, I will address the issue on its merits.  *See Lambrix*, 520 U.S. at 525; *Hudson*, 351 F.3d at 216.

In *Taylor v. Louisiana*, 419 U.S. 522 (1975), the Supreme Court held that "the Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from *venires* representative of the community . . . ."  *Id.* at 537.  In order to establish a prima facie violation of the fair-cross-section requirement, a defendant must demonstrate three elements: (1) that the group alleged to be excluded is a "distinctive group" in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due

to systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979).  When potential jurors are systematically excluded from the jury pool on the basis of race, structural error occurs. *Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986).  Structural error is not subject to harmless-error review. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006) (citing *Arizona v. Fulminante*, 499 U.S. 279, 309-310 (1991)).

Even assuming that Petitioner could meet the first two prongs of the *Duren* test, he fails to demonstrate third prong of the test.  Petitioner argued to the trial court that, although the percentage of African Americans in the county was 14%, the number of African American and Hispanic venire members was small, including only 4 African Americans out of 54 potential jurors, or 7.4%.   (*See* Tr. I at 152.) Petitioner, however, failed entirely to argue or demonstrate that underrepresentation of minority jurors resulted from the systematic exclusion of the group in the jury-selection process.  *See Duren v. Missouri*, 439 U.S. at 364.  The fair-cross-section claim, therefore, was unsupported.[6]

VIII.   Ineffective Assistance of Appellate Counsel

In his first motion for relief from judgment, Petitioner argued that his appellate attorney rendered ineffective assistance of counsel when he failed to investigate Petitioner's claims on appeal, neglected to raise issues that were preserved at trial, and failed to seek an evidentiary hearing under *People v. Ginther*, 212 N.W.2d 922 (Mich. Ct. 1973), in order to develop the factual record for his claim that trial counsel was ineffective.  Petitioner provides no additional detail or argument to support his claim that appellate counsel was ineffective.

---

[6]It is also worth noting that the seated jury included two minority members out of 14 jurors., or about 14%, which is in line with the percentage of African-Americans in the county.  (*Id.*)

A petitioner claiming ineffective assistance of counsel must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Strickland*, 466 U.S. at 687-88. An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

In an order and opinion denying Petitioner's first motion for relief from judgment, the Berrien County Circuit Court applied the applicable federal standard:

> . . . Defendant asserts that he asked his appellate counsel to raise any and all issues that had arguable merit. Defendant now claims that his appellate counsel was ineffective in failing to raise the issues now raised in this motion. To prove ineffective assistance of counsel, Defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the Defendant as to deprive him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-88, 690 (1984); *People v Pickens*, 446 Mich 298, 302-303 (1994). The Defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Strickland, supra* at 690. The defendant must show that but for counsel's poor performance the result would have been different. *People v Messenger*, 221 Mich App 171, 181 (1997). This Court will not substitute its

- 50 -

judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. *People v Barnett*, 163 Mich App 331, 338 (1987).

Appellate counsel's "failure to raise every conceivable issue does not constitute ineffective assistance of counsel." *People v. Reed*, 198 Mich App 639, 646 (1993). "The fact that counsel failed to recognize or failed to raise a claim despite recognizing it does not per se constitute cause for relief from judgment. *Id.* at 647. "A deliberate, tactical decision not to pursue a particular claim is not the type of circumstance envisioned by subchapter 6.500 to constitute 'good cause' for failure to raise an issue in the appeal as of right." *Id.* In this case, Defendant has failed to show that his appellate counsel's failure to raise these issues on appeal was the result of deficient performance as opposed to strategy. "Counsel must be allowed to exercise reasonable professional judgment in selecting those issues most promising for review." *Id.* Thus, appellate counsel's decision not to raise these issues on appeal does not constitute ineffective assistance.

Defendant has also failed to show that he was prejudiced by appellate counsel's actions or that but for counsel's alleged errors, the results of the proceedings would have been different. In *Calhoun*, the Michigan Court of Appeals stated that "in light of the overwhelming physical evidence and testimony against defendant, he cannot demonstrate that" he was prejudiced. *People v. Calhoun*, No. 237287 at *7 (Mich App October 21, 2003). Based on the foregoing reasons, Defendant has not met his burden in showing that his appellate counsel was ineffective.

(12/6/2005 Cir. Ct. Op. at 4-5, docket #40.) The state-court's rejection of Petitioner's claim that appellate counsel was ineffective is entitled to "doubly" deferential review. *Harrington*, 131 S. Ct. at 788 (citing *Knowles*, 556 U.S. at 123); *Pinholster*, 131 S. Ct. at 1403; *Premo*, 131 S. Ct. at 740.

Appellate counsel raised four grounds for relief on direct review to the Michigan Court of Appeals. The court of appeals carefully and thoroughly analyzed each of Petitioner's claims that trial counsel was ineffective and found both that counsel's performance was not deficient and that Petitioner was not prejudiced. Although appellate counsel did not succeed on direct appeal, the grounds he raised were not frivolous. In fact, the substance of those claims necessitated extensive analysis by the Michigan Court of Appeals.

- 51 -

Beyond his sweeping claim that appellate counsel should have moved for an evidentiary hearing to support his claim that trial counsel provided ineffective assistance, Petitioner does not allege any additional facts that could have been discovered at an evidentiary hearing that would have led to a different result. Petitioner therefore cannot demonstrate that appellate counsel should have requested such a hearing. Because the underlying issue is meritless, appellate counsel was not ineffective in failing to raise it on appeal. *Willis*, 351 F.3d at 745; *Bradshaw*, 591 F.3d at 523; *Greer*, 264 F.3d at 676.

Further, Petitioner's argument that appellate counsel was ineffective in failing to challenge the sufficiency of the arrest warrant is frivolous. As previously discussed, an illegal arrest or detention does not void a subsequent conviction. *See Gerstein*, 420 U.S. at 119. As a result, counsel was not ineffective in failing to raise the claim on direct appeal. *Willis*, 351 F.3d at 745; *Bradshaw*, 591 F.3d at 523; *Greer*, 264 F.3d at 676. Moreover, Petitioner's freestanding claim that the prosecutor engaged in misconduct by withholding evidence has been rejected on the merits. Appellate counsel therefore was not ineffective in failing to raise the claim on appeal. *Id,*

In his last argument concerning the ineffective assistance of appellate counsel, Petitioner contends that counsel erred in failing to raise on appeal Petitioner's objection to the composition of the jury venire. As earlier discussed, Petitioner's claim that he was deprived of a jury drawn from a fair cross-section of the community is unsupported by the record. Counsel had no factual basis on which to rest an appeal. Counsel therefore was not ineffective in failing to raise the claim. *Id.*

In sum, Petitioner cannot demonstrate that any of his proposed appellate claims were "clearly stronger than issues that counsel did present." *Robbins*, 528 U.S. at 289. He therefore fails to overcome the presumption that appellate counsel rendered constitutionally effective assistance.

The state court's rejection of Petitioner's claim that appellate counsel was ineffective therefore was entirely reasonable.

IX.   Sentence Scoring Errors

In his supplemental ground for habeas relief, Petitioner contends that certain Prior Record Variables (PRVs) under the sentencing guidelines were misscored in reliance upon a prior conviction for which Petitioner was neither represented by counsel nor constitutionally waived counsel, in violation of *Gideon v. Wainwright*, 372 U.S. 335 (1963).  The issue was raised for the first time in Petitioner's second motion for relief from judgment

Under Michigan law, effective August 1, 1995, a defendant may file only one motion for relief from judgment.  *See* Mich. Ct. R. 6.502(G)(1).  The rule provides only the narrowest exception for cases in which a retroactive change in the law occurred after the first motion for relief from judgment was filed.  Mich. Ct. R. 6.502(G)(2).  A defendant may not appeal the denial or rejection of a successive motion.  Mich. Ct. R. 6.502(G)(1).  On October 12, 2010, the Berrien County Circuit Court denied Petitioner's second motion for relief from judgment as improper under Mich. Ct. R. 6.502(G)(1).  No appeal was filed from the circuit court order, presumably because such an appeal was not allowed under Mich. Ct. R. 6.502(G)(1).

At the time Petitioner filed his first motion for relief from judgment in 2005, M.C.R. 6.502(G) was a firmly established and regularly followed procedural rule that would be sufficient to invoke the doctrine of procedural default. *See Porter v. Smith*, 197 F. Supp. 2d 827, 832–33 (E.D. Mich. 2002).  Because Petitioner's second motion for relief was rejected by the Berrien County Circuit Court pursuant to M.C.R. 6.502(G), the claim is procedurally defaulted.  *Id.* (citing *Erwin v. Elo*, 82 F. App'x 405, 406–07 (6th Cir. 2003)).

- 53 -

Petitioner therefore must demonstrate cause excusing his default and actual prejudice or that the lack of habeas review will result in manifest injustice. *See House*, 547 U.S. at 536. Petitioner has not and cannot show the requisite cause excusing his default. Petitioner repeatedly has advanced arguments in the Michigan courts, seeking out and presenting new grounds with every defeat. Even assuming that he intended to raise the ineffective assistance of appellate counsel as cause excusing his default, that argument would not explain why he could not have raised the argument in his first motion for relief from judgment.

Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy*, 757 F.2d at 100 (6th Cir. 1985). Petitioner's ninth habeas ground therefore must be denied.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Dated:  April 30, 2014                              /s/  Joseph G. Scoville
                                                    United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).